**MT. EMMONS MINING COMPANY, a Delaware corporation, and AMAX Inc., a New York corporation, Plaintiffs-Appellees,**

v.

**TOWN OF CRESTED BUTTE; Director of Public Works of the Town of Crested Butte; Larry Adams, Director of Public Works of the Town of Crested Butte; Town Manager of the Town of Crested Butte; Harold J. Stalf, Town Manager of the Town of Crested Butte, Respondents-Appellants.**

**No. 82SA256.**

Supreme Court of Colorado,
En Banc.

Nov. 5, 1984.

---

Gorsuch, Kirgis, Campbell, Walker & Grover, Leonard M. Campbell, Stanley G. Harvey, Denver, Bratton & Zimmerman, L. Richard Bratton, Gunnison, Popham, Haik, Schnobrich, Kaufman & Doty, Ltd., Raymond A. Haik, R. Daniel Scheid, Minneapolis, Minn., A. Walter Wise, Golden, for plaintiffs-appellees.

Ronald J. Landeck, Moscow, Idaho, Rodney B. Proffitt, Crested Butte, for defendants-appellants.

Gerald E. Dahl, Frisco, for amicus curiae, Northwest Colorado Council of Governments.

Tami A. Tanoue, Denver, for amicus curiae, Colorado Mun. League.

QUINN, Justice.

The Town of Crested Butte and various town officials (collectively Crested Butte) appeal from an adverse summary judgment declaring the town's Watershed District Permit Ordinance invalid and permanently enjoining its enforcement against Mount Emmons Mining Company and AMAX, Inc. (collectively AMAX). The District Court of Gunnison County held that the ordinance, which required a company such as AMAX to obtain a permit from the town council before undertaking new activities in the town's watershed district, unconstitutionally conflicted with several state and federal statutes and was irreconcilable with the state constitutional right to appropriate water. Because there are both factual questions and mixed questions of law and fact that must be resolved before AMAX's constitutional claims can be appropriately resolved, we reverse the summary judgment and remand the case to the district court for further proceedings.

I.

On July 21, 1980, Crested Butte, a home rule municipality, enacted Ordinance No. 5, Series 1980, which amended Chapter 15 of the Crested Butte Municipal Code by adding Article 15-3. The ordinance established a "watershed district" encompassing 13,000 acres in the Coal Creek and Wild Creek drainage basins west of the town and established procedures and standards for Watershed District Permits in connection with various activities within the district.[1] It was the enactment of this ordinance that prompted AMAX, which conducts extensive mining activities on lands within the watershed district, to seek declaratory and injunctive relief with respect to the applicability of the ordinance to its ongoing operations.

The ordinance is expressly premised on the authority granted to home rule cities by section 31-15-707(1)(b), 12 C.R.S. (1977), to maintain and protect a town's water works from injury by extending its jurisdiction over the territory occupied by its water works and "over the stream or source from which the water is taken for five miles above the point from which it is taken and to enact all ordinances and regulations necessary to carry the power conferred in this paragraph (b) into effect."[2] The watershed district created by the ordinance lies

---

1. We learn the following from evidence offered during the hearing on AMAX's request for a preliminary injunction and from the order granting such relief. Crested Butte supplies most of its domestic water needs from Coal Creek. Commencing in the mountains several miles west of Crested Butte, Coal Creek flows down a canyon in a generally easterly direction and collects water from several tributaries before it eventually passes through the town itself. Crested Butte diverts water from Coal Creek through a concrete intake structure located on United States Forest Service land approximately two miles west of the town pursuant to a special use permit. On occasion, Crested Butte also diverts water from Wildcat Creek at a point just above its confluence with Coal Creek approximately one and one-half miles west of the town. The water diverted from Coal Creek and Wildcat Creek is then transmitted to a storage reservoir, where it is processed in a water treatment plant before delivery to town residents for use.

Historically, the water in Coal Creek is very turbid, particularly during the heavy spring runoff, and contains excessive metal concentrations. The presence of many active and inactive mines in the watershed area also causes special water quality problems for Crested Butte. In 1975, for example, tailing material from AMAX's Keystone Mine, located approximately one mile northwest of Crested Butte's point of diversion on Coal Creek, escaped from a tailing pond and contaminated the creek.

Documents admitted at the preliminary injunction hearing indicate that Crested Butte, during the late 1970's and 1980, considered several alternative means of improving water quality and of securing sufficient water to supply future needs. It was during this period that it enacted the Watershed District Permit Ordinance after extensive public comment.

2. The intent and purpose of the ordinance is expressed in the following preface:

WHEREAS, the Town of Crested Butte is a Home Rule Municipality pursuant to Article XX of the Constitution of the State of Colorado, and

WHEREAS, the Town of Crested Butte, by virtue of such Home Rule status, may adopt such ordinances relative to local and municipal matters as are necessary to effectuate the purposes and intent of power granted to municipalities and such other matters which

outside the corporate boundaries of Crested Butte and includes, in addition to the properties of AMAX, the properties of many other landholders and lands within the Gunnison National Forest.

Article 15–3(D)(2) of the ordinance makes it unlawful to cause injury to the town's waterworks. Although the ordinance prohibits any person [3] from engaging in a variety of activities, including surface and subsurface mining, without first obtaining a Watershed District Permit, Crested Butte Municipal Code Article 15–3(D)(1) (1980),[4] it makes an exception for activity in progress. Article 15–3(H) expressly states that "[t]he lawful use of any building, structure or land existing at the time of the enactment of this Article may be continued even though it does not conform to the requirements of this Article," and that ordinary repairs and maintenance are allowed, but that "[a]ny change, expansion, alteration or enlargement of [an] existing lawful use shall be subject to all requirements of this Article."

Article 15–3(E)(1)(f) requires a permit applicant to pay a fee "sufficient to cover the costs of publication, hearing, processing, administration, inspection and enforcement of such requested permit." The minimum fee is ten dollars, but the town has the right to charge an additional fee sufficient to cover the town's costs prior to the issuance or denial of any permit. *Id.* The permit application must be accompanied by a detailed description of the proposed land use, identifying any activity that could cause a foreseeable risk of pollution to the

could be delegated to municipalities by the State of Colorado, and

WHEREAS, Section 14–2 of the Home Rule Charter for the Town of Crested Butte confers all home rule powers to the Town of Crested Butte, and

WHEREAS, the Town of Crested Butte diverts its municipal water supply from Coal Creek and Wildcat Creek located westerly of the Town of Crested Butte by virtue of a water rights decree recorded in Water Division 4, District No. 59, page 573, which carries priority No. 5 named the Crested Butte Water District and Wildcat Pipeline, and

WHEREAS, the Town of Crested Butte owns and uses water storage rights and maintains a point of diversion on Lake Irwin at the headwaters of Coal Creek, and

WHEREAS, water drainage and seepage from land use activities within the Coal Creek and Wildcat Creek Watershed [affect] the quality and quantity of the water supply diverted for use by the Town, and

WHEREAS, the Town Council of the Town of Crested Butte finds that the maintenance and protection of an adequate water supply of the highest quality is essential to the public health, safety and welfare of the citizens of the Town, and

WHEREAS, no other source of water supply diversion exists for the citizens of the Town, and

WHEREAS, the Town has entered negotiations for a Cooperative Agreement with the United States Forest Service under the provisions of the Act of June 12, 1960 (16 U.S.C. 530) for the purpose of protecting the municipal watershed of the Town of Crested Butte which lies within National Forest lands, and

WHEREAS, the Town, by virtue of Section 31–15–707(1)(b), Colorado Revised Statutes, 1973, as amended, has been granted by the State of Colorado the power to enact ordinances and regulations for the purpose of maintaining and protecting the Town's waterworks from injury and the water from pollution, and

WHEREAS, the Town finds that increased activity within the area of the Town's water supply poses a danger to that supply which could affect the health, safety and welfare of the citizens of the Town of Crested Butte, and

WHEREAS, the Town Council desires to exercise all right, power and authority under law to provide its citizens with an adequate water supply of the highest quality which the Town Council finds to be a matter of local concern.

3. Article 15–3(C)(6) defines "person" as meaning "any individual, corporation, business trust, estate, trust, partnership, association or any other legal entity."

4. Article 15–3(D)(1) of the ordinance prohibits any individual or corporation from engaging in the following activities unless a Watershed District Permit is first obtained: constructing a sewage disposal system; excavating, grading, filling or surfacing; removing vegetation; timber harvesting, except for the removal of dead trees for firewood or domestic purposes; drilling operations; altering water drainage courses; surface and subsurface mining operations; spraying or using herbicides; using, handling, storing, or transmitting toxic, hazardous, or radioactive substances; and using, handling, storing, or transmitting flammable explosive materials, except for domestic uses or within vehicular storage tanks.

town water supply, together with a description of the measures which the applicant will employ to obviate these risks. Crested Butte Municipal Code, Article 15–3(E)(1)(b) and (d) (1980).

Within sixty days after an application is filed, the Director of Public Works is required to submit an analysis of the project to the town council. Crested Butte Municipal Code Article 15–3(E)(2)(a) (1980).[5] If the director concludes that the proposed activity does not present a foreseeable risk of pollution to the town's water supply,[6] he is authorized to classify the activity as posing only a "minor impact." Crested Butte Municipal Code Article 15–3(E)(2)(c) (1980). The town council must then conduct a hearing and render a decision approving or denying the permit within 45 days. *Id.* If the project is not classified as posing only a "minor impact," the ordinance requires the town council, after a hearing, to render a decision on the issuance of a permit within six months. Crested Butte Municipal Code Article 15–3(E)(3) (1980).[7] The permit applicant has the burden of proving that the proposed activity "does not present or create a foreseeable risk of pollution" to the town's water supply, waterworks, or to "any water sources tributary thereto for five miles above any point from which water is diverted for use" by the town. Crested Butte Municipal Code Article 15–3(E)(4) (1980). The ordinance authorizes the town council to prescribe any conditions in a permit that it may deem necessary to effectuate "the intent of this Watershed District." Crested Butte Municipal Code Article 15–3(E)(5) (1980). A person desiring to challenge the town council's decision on a permit application is required to file an appeal within thirty days in the District Court of Gunnison County. Crested Butte Municipal Code Article 15–3(J) (1980).

Violation of any provision of the ordinance is punishable by a fine not to exceed $300 for each offense, and a willful and wanton violation is also punishable by imprisonment not to exceed 90 days. Crested Butte Municipal Code Article 15–3(I)(1) (1980). Each day on which a violation occurs is deemed a separate offense. *Id.*

After the ordinance was enacted, AMAX, without consulting town officials about the applicability of the ordinance to its activities and without seeking a Watershed District Permit, filed on August 19, 1980, a complaint in the district court for declaratory and injunctive relief against Crested Butte and various town officials. AMAX claimed that beginning in 1974 it acquired a large tract of land on the south side of Mount Emmons, where it believed a large deposit of molybdenum was located, and also procured rights to various mining claims throughout the Watershed District; that AMAX had stabilized its tailing ponds at the Keystone Mine, the principal site of its activities, that it had also commenced construction of a water treatment plant and a heavy metal treatment plant, and that it had performed extensive excavation

5. Article 15–3(E)(2) requires the director of public works to consider the following factors, among any others that might be deemed relevant, in making an analysis of the proposed activity under a permit application: the nature and extent of the proposed activity; the proximity to existing water courses; drainage patterns and control measures; soil criteria; slope steepness and stability; effects of denudation; geologic hazards, including but not limited to avalanche paths, flood plains, high water tables, fault zones and similar factors; point source effluent and emissions into the air or water; ambient and non-point source emissions into air or water; vehicular or motorized activity; and fire hazard.

6. Article 15–3(C)(4) defines a foreseeable risk as "the reasonable anticipation that harm or injury may result from acts or omissions." Article 15–3(C)(7) defines "pollution" as "man-made, man-induced, or natural alteration of the physical, chemical, biological and radiological integrity of water."

7. Article 15–3(E)(3) creates two exceptions to the six month requirement: if a proposed activity requires the approval of or permit from county, state or federal officials, and this approval or permit procedure "exceeds the time requirements of this Article," the town has an additional ninety days in which to conduct a hearing and render a decision; and if the town council requests additional information from an applicant, then "the public hearing and decision may be delayed or continued until receipt of such additional information."

and drilling incident to its mining operations; that it would be required in the near future to perform various activities prohibited by the ordinance unless a permit were to be first obtained; and that these activities included the gathering of data for an environmental impact study conducted by the United States Forest Service, assessment and other work in connection with mining claims and other property rights, reclamation and sampling activities necessitated by Colorado law, and various activities in compliance with bond obligations applicable to its mining operations.

AMAX asserted that the ordinance was invalid for the following reasons: it conflicted with and was preempted by the Colorado Water Quality Control Act, §§ 25–8–101 to –703, 11 C.R.S. (1982 & 1983 Supp.), and the Colorado Mined Land Reclamation Act, §§ 34–32–101 to –125, 14 C.R.S. (1984); it unlawfully impaired AMAX's right to appropriate water and thus violated article XVI, sections 5 and 6 of the Colorado Constitution; it resulted in a taking of property without just compensation;[8] it violated due process of law because it failed to provide adequate standards for the issuance of a permit, failed to give adequate notice of the permit requirements, and conferred unlimited discretion on the town council to withhold or condition a permit;[9] it exceeded the jurisdiction of the town as a home rule community; and it prohibited AMAX's activities on lands within the Gunnison National Forest, which activities were authorized by a special use permit from the United States Forest Service, in violation of the federal preemption doctrine.

Crested Butte answered the complaint by denying that any of AMAX's activities are or have been prohibited by the ordinance. It also asserted that the ordinance does not encompass the same activities regulated by the Colorado Water Quality Control Act, that the Colorado Mined Land Reclamation Act specifically permits land use regula-

tions, that the ordinance does not impair AMAX's right to appropriate water under Colorado law, that the purpose of the ordinance is not to regulate activities of the federal government on federal lands, and that the ordinance was adopted pursuant to Crested Butte's constitutional and statutory authority as a home rule city to enact legislation protecting its water works from injury and its water from pollution, § 31–15–707(1)(b), 12 C.R.S. (1977).

On June 15, 1981, the district court granted AMAX's request for a preliminary injunction. Although acknowledging that AMAX had failed to apply for a permit and that "[t]o date the Town has made no effort to enjoin any activity by AMAX which is otherwise prohibited by the ordinance nor has the Town sought to impose sanctions for any activities performed in violation of the ordinance," the court concluded that injunctive relief was appropriate because AMAX, unless it first obtained a permit, would be adversely affected by the enforcement of the ordinance in connection with various projects contemplated in 1981.

Crested Butte thereafter moved for summary judgment. On November 9, 1981, the court denied Crested Butte's motion. Because the court viewed the case as raising no genuine issue of fact, it entered summary judgment in favor of AMAX. Specifically, the court ruled as follows: the ordinance was irreconcilable with those provisions of the Colorado Water Quality Control Act which vest state agencies with the final authority in the administration of water pollution prevention, abatement, and control, § 25–8–102(4), 11 C.R.S. (1982); the bonding provisions of the ordinance violated the Colorado Mined Land Reclamation Act, which allows only the Mined Land Reclamation Board to issue a permit and to require a financial warranty for mining operations, § 34–32–109(6), 14 C.R.S. (1983 Supp.); the inclusion of drilling operations and water drainage course alterations with-

---

**8.** The district court, in its summary judgment ruling, held that AMAX's "taking" claim was premature because the ordinance could be applied without resulting in any taking.

**9.** AMAX's due process claim was rejected by the court in its summary judgment ruling, the court holding that the ordinance was not facially vague or lacking in adequate standards.

in the permit provisions of the ordinance violates the Colorado Ground Water Management Act, which vests the state engineer with authority over such matters, § 37–90–137(2), 15 C.R.S. (1973); the ordinance, to the extent it grants town officials authority to regulate and prohibit the appropriation of water within the watershed district, violates the constitutional right to divert unappropriated water from a natural stream, Colo. Const. art. XVI, §§ 5 and 6; and the ordinance's apparent applicability to mining operations on lands within the Gunnison National Forest conflicted with the General Mining Law of 1872, 17 Stat. 91 (codified in scattered sections of 30 U.S.C. §§ 21–54), the Mineral Lands Leasing Act of 1920, 30 U.S.C. §§ 181–287, and the Mining and Minerals Policy Act of 1970, 30 U.S.C. § 21a, all of which allow mining operations on public lands upon compliance with certain conditions, and also conflicted with the statutory authority of the United States Forest Service to administer National Forests pursuant to the Organic Administration Act of 1897, 16 U.S.C. §§ 473–482, 551, the Multiple Use-Sustained Yield Act of 1960, 16 U.S.C. §§ 528–31, and the Forest and Rangeland Renewable Resources Planning Act, 16 U.S.C. §§ 1600–1614. The district court entered a permanent injunction barring the enforcement of the ordinance against AMAX, and Crested Butte appealed to this court.[10]

## II.

C.R.C.P. 56(c) permits summary judgment only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." The district court's entry of summary judgment in favor of AMAX was predicated on its determination that Crested Butte's ordinance was preempted by state and federal statutory law and was in conflict with the state constitutional

right to appropriate water. Crested Butte challenges the entry of summary judgment because, in its view, its Watershed Permit Ordinance was a proper exercise of its statutory authority to protect its water works from injury, § 31–15–707(1)(b), 12 C.R.S. (1977), and was therefore neither preempted by federal and state legislation nor in conflict with the constitutional right to appropriate water under Article XVI, section 6 of the Colorado Constitution. We need not reach the merits of Crested Butte's claims at this time because, whatever their validity, we are satisfied that the factual record in this case is not sufficiently developed for final resolution of this case by summary judgment.

Although Crested Butte has not questioned the factual sufficiency of the record, this court may nevertheless notice errors appearing of record, C.A.R. 1(d), especially when these errors are of a fundamental character affecting the reliability of the judgment itself. *See, e.g., Polster v. Griff's of America, Inc.,* 184 Colo. 418, 520 P.2d 745 (1974); *Kendall v. Hargrave,* 142 Colo. 120, 349 P.2d 993 (1960); *Warner v. Barnard,* 134 Colo. 337, 304 P.2d 898 (1956). The exercise of this discretion is especially appropriate in a case involving a record that does not clearly establish the essential evidentiary basis for the rendition of a final judgment on substantial constitutional claims. *See People v. Emeson,* 179 Colo. 308, 500 P.2d 368 (1972). In resolving this case, therefore, we must examine those principles relating to the summary adjudication of constitutional issues in the context of declaratory and injunctive relief.

The purpose of the summary judgment is "to permit the parties to pierce the formal allegations of the pleadings and save the time and expense connected with a trial when, as a matter of law, based on undisputed facts, one party could not prevail." *Ginter, Jr. v. Palmer & Co.,* 196 Colo. 203, 205, 585 P.2d 583, 584 (1978).

---

**10.** Appellate jurisdiction lies in this court because the constitutionality of a municipal ordinance is in question. Sections 13–4–102(1)(b) and 13–4–110(1)(a), 6 C.R.S. (1973 & 1983 Supp.).

Although summary judgment serves the salutary goal of saving judicial resources that otherwise might be expended in protracted litigation, it is not a substitute for trial. As one court observed:

> We have long recognized that no matter how enticing, in an era of congested dockets, is a device to dispose of cases without the delay and expense of traditional trials with their sometime cumbersome and time-consuming characteristics, summary judgment was not devised for, must not be used as, a substitute for trial. Its wholesome utility is, in advance of trial, to test, not as formerly on bare contentions found in the legal jargon of pleadings, but on the intrinsic merits, whether there is in actuality a real basis for relief or defense. Consequently, where the proceedings have indicated that a genuine issue existed, we have consistently rejected appealing shortcuts and not the less so even though it was likely that on a trial, the trier would resolve the disputed issues as one of fact in the same manner as when thought to have been one of law alone.

*Bruce Construction Corp. v. United States,* 242 F.2d 873, 874 (5th Cir.1957). Because the grant of summary judgment denies the party opposing the motion the right to a trial, summary judgment is appropriate *only* in those circumstances where there is no dispute as to material facts and thus no role for the fact finder to play. Thus, a court may enter summary judgment on behalf of a moving or non-moving party if, in addition to the absence of any genuine factual issues, the law entitles one party or the other to a judgment in its favor. *Cool Fuel, Inc. v. Connett,* 685 F.2d 309 (9th Cir.1982); *Morrissey v. Curran,* 423 F.2d 393 (2d Cir.1970), *cert. denied* 399 U.S. 928, 90 S.Ct. 2245, 26 L.Ed.2d 796 (1970); 6 J. Moore, *Moore's Federal Practice* § 5612 (2d ed. 1982 & 1982–84 Supp.).

█ In the context of summary judgment proceedings, a material fact is simply a fact the resolution of which will affect the outcome of the case. A mixed question of law and fact involves the application of a legal standard to a particular set of evidentiary facts in resolving a legal issue. *See T.S.C. Industries, Inc. v. Northway,* 426 U.S. 438, 450, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976). Even if the historical facts underlying the mixed question might be undisputed, as long as a reasonable trier of fact nevertheless could draw divergent inferences from the application of the legal criteria to the facts, summary judgment should be denied. Not only is the party against whom the judgment might otherwise be entered entitled to the benefit of all favorable inferences that may be drawn from the facts, but, with the case in this particular evidentiary posture, it cannot be definitively determined that the party to be favored by the court's putative action is entitled to judgment as a matter of law. *T.S.C. Industries, Inc.,* 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757; *Gleason v. Guzman,* 623 P.2d 378 (Colo.1981); *O'Herron v. State Farm Mutual Auto Insurance Co.,* 156 Colo. 164, 397 P.2d 227 (1964); *Roderick v. City of Colorado Springs,* 193 Colo. 104, 563 P.2d 3 (1977).

█ Generally, a party challenging the constitutionality of the statute or ordinance must show that the enactment will have an adverse effect on its present or imminent conduct. *E.g., County Court of Ulster County v. Allen,* 442 U.S. 140, 99 S.Ct. 2213, 60 L.Ed.2d 777 (1979); *Federal Lumber Co. v. Wheeler,* 643 P.2d 31 (Colo. 1981). This requirement of some demonstrable injury also arises when injunctive relief is sought. *See, e.g., Wakabayashi v. Tooley,* 648 P.2d 655 (Colo.1982); *Rathke v. McFarlane,* 648 P.2d 648 (Colo.1982). Given the limited purpose of a preliminary injunction, however, which is to preserve the relative positions of the parties until trial on the merits, coupled with the haste that is often necessary if this purpose is to be accomplished, preliminary injunctions are often granted on the basis of procedures that are less formal and complete than the trial on the merits. For these reasons, a finding of irreparable injury made in connection with a request for a

preliminary injunction is not conclusive for purposes of a motion for summary judgment on the ultimate merits of the controversy. *E.g., University of Texas v. Camenisch,* 451 U.S. 390, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981); *Hamilton Watch Co. v. Benrus Watch Co.,* 206 F.2d 738 (2d Cir.1973).

■■■■ We recognize that the required showing of demonstrable injury is somewhat relaxed in declaratory judgment actions. The Uniform Declaratory Judgments Law, §§ 13–51–101 to –115, 6 C.R.S. (1973 & 1983 Supp.), is a remedial statute which must be liberally construed and administered. Its purpose is to settle controversies and to afford parties judicial relief from uncertainty and insecurity with respect to their rights and legal relations. § 13–51–102, 6 C.R.S. (1973); *see also* C.R. C.P. 57(b). Our cases discussing declaratory relief recognize that one need not "risk the imposition of fines or imprisonment or the loss of property or profession in order to secure the adjudication of uncertain legal rights." *Community Tele-Communications, Inc. v. Heather Corp.,* 677 P.2d 330, 334 (Colo.1984); *see Rathke,* 648 P.2d 648; *Johnson v. District Court,* 195 Colo. 169, 576 P.2d 167 (1978); *Colorado State Board of Optometric Examiners v. Dixon,* 165 Colo. 488, 440 P.2d 287 (1968). A party seeking declaratory relief, however, must still demonstrate that the challenged statute or ordinance will likely cause tangible detriment to conduct or activities that are presently occurring or are likely to occur in the near future. *See Heather Corp.,* 677 P.2d at 334–35; *Beacom v. Board of County Commissioners,* 657 P.2d 440, 447 (Colo. 1983); *Theobald v. Board of County Commissioners,* 644 P.2d 942 (Colo.1982); *see e.g., Farmers Elevator Co. v. First National Bank,* 176 Colo. 168, 489 P.2d 318 (1971); *People ex rel. Inter-Church Temperance Movement v. Baker,* 133 Colo. 398, 297 P.2d 273 (1956).[11] Thus, while summary judgment might be an appropri-

ate remedy in a declaratory judgment action involving a declaration of rights under a statute or an ordinance, it simply does not follow that the requirements for granting summary judgment should be any less stringent because constitutional issues are raised in a declaratory judgment context.

■■■■ What is particularly important is that constitutional issues, regardless of the particular form of relief requested, not be resolved on an inadequate factual basis. A constitutional challenge to legislation necessarily implicates the separation of powers doctrine under our tripartite system of government. Each branch of government must be accorded sufficient operating room to exercise its constitutional authority. Indeed, the judicial axiom that legislative enactments are vested with a presumption of constitutionality is nothing more than an obvious acknowledgement that the law-making function should not be subjected to unwarranted judicial encroachment. We have required, therefore, in cases involving neither a fundamental right nor a suspect classification that the party challenging the constitutionality of a statute or ordinance bear the heavy burden of proving its unconstitutionality beyond a reasonable doubt. *E.g., People v. Alexander,* 663 P.2d 1024 (Colo. 1983); *Dawson v. PERA,* 664 P.2d 702 (Colo.1983); *Beathune v. Colorado Dealer Licensing Board,* 198 Colo. 483, 601 P.2d 1386 (1979). Moreover, where a statute or ordinance admits of more than one possible construction, one of which is constitutional, the constitutional construction must be adopted. *E.g., City of Arvada v. City and County of Denver,* 663 P.2d 611 (Colo. 1983); *People ex rel. Arvada v. Nissen,* 650 P.2d 547 (Colo.1982); *People v. Smith,* 638 P.2d 1 (Colo.1981). These standards of constitutional adjudication point up what is fundamentally nothing more than sound jurisprudence—to withhold decision on the validity of a legislative enactment until such time as the issues are solidly fixed by

---

11. Section 13–51–106, 6 C.R.S. (1973), and C.R. C.P. 57(b) echo this view by requiring as a prerequisite to declaratory relief that the ordi-

nance affect the legal relations of the parties seeking the declaratory judgment.

an evidentiary record that will permit a final resolution of the controversy.

These principles must serve as a guide to our resolution of this case, and it is in that light that we examine the district court's entry of summary judgment on the basis of the factual record before it.

### III.

Although AMAX in its complaint described present and contemplated sampling, research, and construction activities within the watershed district, it did not explicate the manner in which, or the extent to which, the ordinance would detrimentally affect these operations. Nor did the court do so in its order of summary judgment. This state of the record leaves us with several unresolved questions that might well affect the ultimate resolution of AMAX's claims.

The initial category of questions centers on the applicability of the ordinance to AMAX's present and prospective activities. Article 15–3(H) of the ordinance expressly states that "[t]he lawful use of any building, structure or land existing at the time of ... enactment ... may be continued even though it does not conform to the requirements of this Article." Crested Butte Municipal Code Article 15–3(H) (1980). If Crested Butte officials determine that the ordinance applies only to new land use activities or significant changes in existing land uses, we are at a loss to know how the permit procedures and penalty provisions of the ordinance could have any effect upon AMAX's operations that had already commenced prior to July 21, 1980, the date of enactment. The record also leaves unanswered whether and to what extent town officials might view AMAX's future activities as a continuation of a prior lawful use of the land within the scope of Article 15–3(H). The ordinance conceivably might have no bearing on these activities at all. The point here is that the propriety of the town's decision on the applicability of the ordinance to AMAX's activities would raise a mixed question of law and fact, involving as it does the application of a legal standard to a particular set of facts, *T.S.C. Industries, Inc.*, 426 U.S. at 450, 96 S.Ct. at 2132, and unless the only possible inference is that the town's decision is irreconcilable with the state and federal law, summary judgment would not be appropriate.

The next range of questions involves such matters as whether and to what extent AMAX will be adversely affected by the application of the ordinance to its activities. Even if the ordinance is construed to apply to certain of AMAX's activities, AMAX can still avail itself of the permit procedures. Under Article 15–3(E)(2)(c), the director of public works might find that AMAX's activities "[do] not present or create a foreseeable risk of pollution to the water supply of the Town of Crested Butte," in which event the director would classify AMAX's permit application as "minor impact" and AMAX would be entitled to a hearing and decision by the town council within forty-five days. In view of this contingency, there are unresolved factual questions relating to the existence, nature, and extent of any injury that AMAX might conceivably sustain under a "minor impact" permit. Only if the director of public works would fail to classify AMAX's permit application as "minor impact" would AMAX face the possibility of waiting six months for a hearing and determination on its application, Crested Butte Municipal Code Article 15–3(E)(3) (1980), and only then might AMAX arguably be adversely affected by this delay. In its present posture, the case does not permit an informed judgment regarding what injury, if any, AMAX faces by virtue of the mere existence of the ordinance.[12]

---

**12.** The uncertainty with respect to the applicability of the permit provisions to AMAX distinguishes this case from *CF&I Steel Corp. v. Air Pollution Control Commission,* 199 Colo. 270, 610 P.2d 85 (1980), where a "fugitive dust" emission control regulation adopted by the Colorado Air Pollution Control Commission was clearly applicable to CF&I, which owned and operated a steel plant in Pueblo, Colorado, and used large quantities of limestone, iron ore and other ma-

Furthermore, the manner in which the ordinance might ultimately be applied, in addition to raising mixed questions of law and fact, could well undercut AMAX's constitutional challenges or otherwise significantly alter the issues raised in its complaint. For example, it does not follow that merely because the Colorado Water Quality Control Commission has "final authority" in the administration of water pollution prevention, § 25–8–102(4), 11 C.R.S. (1982), any permit issued to AMAX pursuant to the ordinance would thereby be invalid. The permit conditions might conceivably deal only with sources of water pollution from disturbed land areas or mine tailing piles, neither of which is controlled by the "point source" permit procedures of the Water Quality Control Act. *See* §§ 25–8–203(14), (15) and (16) (definitions of "point source," "pollutant" and "pollution") and 25–8–501 to –506 (permit system), 11 C.R.S. (1982 & 1983 Supp.). Nor does the record show that, as an undisputed fact, the conditions of any permit issued to AMAX would necessarily contain bonding or other conditions conflicting with the Colorado Mined Land Reclamation Act, §§ 34–32–101 to –125, 14 C.R.S. (1983), and, on that account, be beyond the scope of Crested Butte's authority over its own waterworks. We also note that the ordinance does not purport to control the appropriation of water rights, but only deals with water pollution control measures incident to various activities within the Watershed Permit District. Nothing in the record warrants the conclusion that any permit issued to AMAX would be so conditioned that it impaired AMAX's right to appropriate ground waters of the state under the

Colorado Ground Water Management Act, §§ 37–90–101 to –141, 15 C.R.S. (1973 & 1983 Supp.), or water from natural streams under Article XVI, sections 5 and 6 of the Colorado Constitution. Finally, with respect to AMAX's preemption claim under federal mining laws and statutes dealing with the administration of national forest lands, it would be sheer speculation to hypothesize how and to what extent the conditions of any permit might possibly conflict with the statutory and regulatory scheme applicable to federal lands within the Gunnison National Forest.

■ What we have, therefore, is a summary adjudication of issues based on a series of assumed facts—namely, that the ordinance will be applied to AMAX's activities; that AMAX will be denied a permit, or will be unable to obtain a decision on a permit application in a timely fashion, or will be issued a permit the conditions of which are in direct conflict with state and federal legislation; and that as a result of the permit process AMAX will be adversely affected in its mining operations or will be forced to proceed at the peril of criminal sanctions. That these assumptions are mere hypothetical possibilities and nothing more serves only to point up once again the broad array of questions that must yet be resolved before AMAX's claims can be appropriately resolved by summary judgment.

The summary judgment and the concommitant grant of permanent injunctive relief are reversed and the cause is remanded to the district court for further proceedings.

terials that were the sources of fugitive dust as defined in the regulations. In *CF&I Steel Corp.,* it was "not disputed that CF&I's activities [were] embraced within the scope of the regulation." 199 Colo. at 273, 610 P.2d at 88. Nor was it disputed that the regulation applied to Colorado Ute Electrical Association, which would be required to expend substantial sums in order to comply with the regulation. 199 Colo. at 273–74, 610 P.2d at 88. Indeed, the Colorado Air Pollution Control Commission conceded that both CF&I and Colorado Ute were so adversely affected by the regulation as to qualify for de-

claratory relief. 199 Colo. at 275, 610 P.2d at 89. Under these circumstances this court held that both CF&I and Colorado Ute Electrical Association could invoke declaratory judgment proceedings to establish their rights and obligations under the regulation. In this case, in contrast, both AMAX and the district court merely assumed that the Crested Butte ordinance is applicable to the present or prospective activities of AMAX and, further, that the mere enactment of the ordinance would detrimentally affect these activities of AMAX.