The **TOWN OF CARBONDALE**, a Colorado municipal corporation, Plaintiff–Appellee,

v.

**GSS PROPERTIES, LLC**, a North Carolina limited liability company, Defendant–Appellant.

No. 03CA2523.

Colorado Court of Appeals, Div. II.

Sept. 8, 2005.

Certiorari Denied July 17, 2006.

Caloia, Houpt & Hamilton, P.C., Mark E. Hamilton, Glenwood Springs, Colorado; Robert B. Emerson, P.C., Robert B. Emerson, Carbondale, Colorado, for Plaintiff–Appellee.

Walter H. Sargent, P.C., Walter H. Sargent, Colorado Springs, Colorado, for Defendant–Appellant.

VOGT, J.

In this action for violation of a watershed protection ordinance, defendant, GSS Properties, LLC, appeals the trial court judgment directing that a decree of abatement issue against it and in favor of plaintiff, the Town of Carbondale. We reverse and remand with directions.

In 1999, GSS purchased a fifty-five-acre parcel located above the Town's Nettle Creek water plant. GSS began construction and earthmoving activities on the property and started using herbicides and other chemicals to eradicate noxious weeds and dandelions.

In June 2001, the Town filed this action against GSS. It sought damages on a theory of negligence, alleging that GSS's construction activities had allowed dirt to spill into the creek and eventually caused ruptures of the Town's water main. The complaint also alleged that GSS's construction work and use of chemicals on the property constituted a public nuisance that the Town was entitled to abate under its ordinances. The Town sought, as relevant here, preliminary and permanent injunctive relief "restraining the use or storage of chemical herbicides or pesticides on the Property without implementing the necessary application and storage controls to prevent contamination of the Town's public water supply."

The parties entered into a stipulation intended to resolve the dispute. The stipulation included a provision for a plan regarding the use of herbicides and other agricultural chemicals on the property. GSS subsequently presented such a plan, but the Town determined it was unacceptable.

GSS moved to enforce the stipulation. In March 2003, the trial court denied the motion. Trial was set for October 2003.

In June 2003, GSS moved to amend its answer to add, as an affirmative defense, that the Town's ordinance was preempted by state law. It also asserted preemption as a basis for a motion for partial summary judgment on the Town's claim for injunctive relief precluding the use of agricultural chemicals on the property.

In August 2003, the trial court denied the motion to amend as untimely, stating: "To allow the amendment at this stage would substantially change the nature of the trial and put the trial date in jeopardy." It also denied GSS's motion for partial summary judgment. However, in its order, the court "recognize[d] that the issues raised in the motion may be appropriate to address at mid-trial or other appropriate stages of the trial to the court."

A bench trial was held in October 2003. Because the issues regarding GSS's construction activities had been largely resolved, the focus of the trial was on whether, based on the Town's watershed protection ordinance, GSS should be enjoined from using any herbicides, chemical pesticides, or fertilizers on the property. The trial court refused to permit GSS to introduce evidence or present argument regarding state and federal standards for water quality and use of agricultural chemicals, or regarding the Town's authority to promulgate its ordinance. The court considered these issues irrelevant in light of its denial of GSS's motion to amend and the Colorado Supreme Court's refusal to grant relief from that ruling pursuant to C.A.R. 21. Those rulings, the trial court stated, were now the "law of the case."

At the conclusion of the trial, the court concluded that GSS had violated the Town's ordinance by conducting "a business which will pollute or lead to the contamination or pollution ... of an area five miles above the point from which water is taken by the Town's Nettle Creek intake system." However, it expressed "no conclusion as to whether the Town's authority to pass such an ordinance is consistent with state law as that issue was not properly raised in the case."

The court entered judgment for the Town in the amount of $8389 on its negligence claim. GSS does not challenge that portion of the judgment on appeal.

The court also concluded that the Town had established its nuisance claim based on GSS's violation of the ordinance, and that the appropriate remedy for the violation was abatement of the nuisance. Accordingly, as pertinent here, the court ordered that GSS was "restrained from storing, mixing, applying or disposing of pesticides, herbicides, fer-

tilizers or chemical compounds on the property in any manner that may pollute the Town's water supply as defined in the ordinance."

## I.

■ GSS contends the trial court erred when, in reliance on its denial of the motion to amend the answer and on the supreme court's refusal to review that ruling, it precluded GSS from introducing evidence of county, state, and federal statutes, regulations, and standards for water quality and the use of agricultural chemicals. We agree.

## A.

■ The supreme court's refusal to issue a rule to show cause upon a request for relief pursuant to C.A.R. 21 has no substantive significance. It does not indicate either approval or disapproval of the trial court ruling that is the subject of the original proceeding. *Atlantic Richfield Co. v. District Court,* 794 P.2d 253 (Colo.1990); *Estate of Milstein v. Ayers,* 955 P.2d 78 (Colo.App.1998). Therefore, the supreme court's denial of GSS's C.A.R. 21 petition did not become the law of the case or preclude the trial court from considering GSS's arguments and proffered evidence in support of its preemption defense.

## B.

■ We further conclude that the trial court erred in relying on its prior denial of GSS's motion to amend to preclude GSS from introducing its proffered evidence at trial.

■ Affirmative defenses must ordinarily be specifically pleaded in the answer. However, "in some instances, an affirmative defense asserted for the first time in a motion for summary judgment will be deemed to be incorporated into the defendant's answer." *Bebo Construction Co. v. Mattox & O'Brien, P.C.,* 990 P.2d 78, 84 (Colo.1999); *see Trujillo v. Farmers Insurance Exchange,* 862 P.2d 962 (Colo.App.1993); *Slabey v. Colorado Real Estate Commission,* 762 P.2d 734 (Colo. App.1988); *Mountain Gravel & Construction Co. v. City of Cortez,* 721 P.2d 698 (Colo.App. 1986). In such cases, if the defendant loses

the motion for summary judgment but wishes to continue to assert the affirmative defense, the trial court is required to permit the defendant to amend its answer. *Bebo Construction Co. v. Mattox & O'Brien, P.C., supra; see also Cox v. Pearl Investment Co.,* 168 Colo. 67, 450 P.2d 60 (1969).

We conclude that application of the rule allowing affirmative defenses to be raised for the first time in a summary judgment motion is particularly appropriate in cases where, as here, the defense is preemption. *See Halprin v. Equitable Life Assurance Society,* 267 F.Supp.2d 1030 (D.Colo.2003)(noting absence of authority for proposition that a preemption defense premised upon statutory application can be waived); *Johnston v. Davis Security, Inc.,* 217 F.Supp.2d 1224, 1227 (D.Utah 2002)(rejecting contention that defendants waived preemption affirmative defense by not raising it in their answer, where issue was raised in motion for partial summary judgment).

Thus, in the circumstances presented here, even though the trial court initially had discretion to deny GSS's motion to amend its answer, the court should have allowed GSS to present evidence and argument on preemption after it denied GSS's timely summary judgment motion based on preemption.

Most of the authorities cited above note that the plaintiff was not prejudiced by the late assertion of the affirmative defense. We need not decide whether lack of prejudice to the plaintiff is a requirement for allowing assertion of an affirmative defense in a summary judgment motion, because, even assuming there is such a requirement, the record affords no basis for concluding that the Town would have been prejudiced in this case.

First, GSS's motion to amend was filed more than four months before trial. The Town opposed amendment on the basis that the motion was untimely and that there was no preemption, but it did not claim it would be prejudiced by the late amendment; rather, it requested that, if amendment were permitted, it be allowed additional time to retain experts, pursue discovery, and file its own dispositive motion on preemption. GSS did not oppose that request. Similarly, when

GSS filed its summary judgment motion three months before trial, the Town did not claim prejudice but simply argued that the preemption issue had been rendered moot by the trial court's intervening order denying leave to amend.

Second, in its order denying summary judgment the trial court expressly stated that the issues raised might be "appropriate to address" at trial. This language put the parties on notice that preemption might be argued at trial, and the trial transcript suggests that the Town was prepared to address the issue. In his opening statement, the Town's counsel attempted to direct the court's attention to authorities supporting local control over environmental issues, but the trial court told him to move on because the issues of the Town's authority and preemption were no longer in the case. Later, counsel for the Town attempted to elicit testimony from the Town's expert regarding federal and state laws concerning protection of source water, but the court again admonished him that these issues were "not going to be litigated in the case."

We therefore conclude that the trial court erred in precluding evidence and argument at trial regarding GSS's preemption defense.

## II.

To determine whether the error requires reversal, we must consider the parties' arguments regarding the merits of GSS's preemption defense. GSS contends that the Town's ordinance, as applied to the facts of this case, is unauthorized by statute, and that it conflicts with and is preempted by five state statutes. The Town responds that none of the statutes cited by GSS preempts municipal authority to abate pollution risks within protected watersheds and that the trial court's exclusion of evidence in support of GSS's preemption defense, even if erroneous, was thus harmless.

Although we do not agree with all the arguments advanced by GSS, we conclude that GSS should have been afforded the opportunity to present evidence establishing that, as applied in this case, the Town's ordinance was preempted because of an operational conflict between it and one or more state statutes.

### A.

■ As an initial matter, we do not agree with GSS that the ordinance at issue here was beyond the scope of the Town's legislative authority.

■ Municipalities have the power to enact ordinances not inconsistent with state law that are necessary and proper to provide for the health and safety of their inhabitants. *See* § 31–15–103, C.R.S.2004; *Town of Frederick v. North American Resources Co.,* 60 P.3d 758 (Colo.App.2002)(*Town of Frederick*). Additionally, the general police power of the governing bodies of municipalities includes the power to "declare what is a nuisance and abate the same and to impose fines upon parties who may create or continue nuisances or suffer nuisances to exist." Section 31–15–401(1)(c), C.R.S.2004.

The ordinance at issue here, enacted by the Town in 1991, states in relevant part:

*Pollution of Water.* A. It is unlawful for any person to discharge or allow the discharge in the town's water system of any substance or material which will in any manner injure or obstruct the system, or which will contaminate or pollute the water, or in any manner, pollute, obstruct or contaminate the water in said water works.

B. As used in this title, the terms "pollute," "contaminate," and "contaminated" include the manmade, man-induced, animal-induced, or natural alteration of the physical, chemical, biological, and radiological integrity of water.

*Pollution of water collection system.*

A. It is unlawful for any person or entity to pollute or contaminate ... or to keep or conduct any business which will contaminate or pollute or lead to the contamination or pollution of:

. . . .

1(c). Any area five miles above the point from which water is taken by any well operated by the town, by the town's Nettle Creek intake system, or any other point from which the town takes water for the town's waterworks.

Carbondale Municipal Code §§ 13.32.010, 13.32.030.

The Town alleged in its complaint that the foregoing ordinance was enacted pursuant to the Town's statutory authority under § 31–15–707(1)(b), C.R.S.2004. That statute provides:

The governing body of each municipality has the power ... [t]o construct or authorize the construction of ... waterworks without their limits and, for the purpose of maintaining and protecting the same from injury and the water from pollution, their jurisdiction shall extend over the territory occupied by such works and all reservoirs, streams, trenches, pipes, and drains used in and necessary for the construction, maintenance, and operation of the same and over the stream or source from which the water is taken for five miles above the point from which it is taken and to enact all ordinances and regulations necessary to carry the power conferred in this paragraph (b) into effect ....

We do not agree with GSS that the ordinance goes beyond the authority conferred by § 31–15–707(1)(b). That statute gives municipalities jurisdiction over "the stream or source" from which the water in their waterworks is taken "for five miles above the point from which it is taken." This jurisdiction necessarily extends to ground water underneath properties within the five-mile area that finds its way into streams in the watershed. See *Colorado Ground Water Commission v. North Kiowa–Bijou Groundwater Management District,* 77 P.3d 62 (Colo. 2003); *Safranek v. Town of Limon,* 123 Colo. 330, 334, 228 P.2d 975, 977 (1951)("Under our Colorado law, it is the presumption that all ground water so situated finds its way to the stream in the watershed of which it lies, is tributary thereto, and subject to appropriation as part of the waters of the stream.").

Further, municipalities are given such jurisdiction for the purpose of "maintaining and protecting [the waterworks] from injury and the water from pollution." The term "protect" contemplates preventive measures undertaken before measurable pollution enters the municipality's water supply. *See People v. Hupp,* 53 Colo. 80, 123 P. 651

(1912); *City of Durango v. Chapman,* 27 Colo. 169, 60 P. 635 (1900); *see also* Webster's Third New International Dictionary 1822 (1976)(defining "protect" as "to cover or shield from that which would injure, destroy, or detrimentally affect"). Thus, a municipality is not limited to enacting ordinances that address only pollution or contamination that has already occurred.

We therefore conclude that enactment of the ordinance at issue here was within the authority granted to municipalities under § 31–15–707(1)(b). GSS, whose property and its underlying ground water were within five miles of the Town's Nettle Creek intake system, was subject to the provisions of the ordinance.

### B.

Because GSS did not raise the issue in the trial court, we do not address its related assertion that the ordinance is overbroad. *See Estate of Stevenson v. Hollywood Bar & Cafe, Inc.,* 832 P.2d 718 (Colo.1992).

### C.

Although enactment of the ordinance was within the Town's statutory authority, the ordinance may nevertheless be invalid if it conflicts with or is preempted by federal or state law. *See Mt. Emmons Mining Co. v. Town of Crested Butte,* 690 P.2d 231 (Colo.1984)(*Mt.Emmons* ); *Town of Frederick, supra.* Thus, we next address GSS's contention that the Town's ordinance is preempted by the following state statutes: (1) the Colorado Water Quality Control Act (CWQCA), § 25–8–101, et seq., C.R.S.2004; (2) §§ 25–1.5–201 to 25–1.5–209, C.R.S.2004, referred to by the parties here as the Colorado Drinking Water Quality Act (CDWQA); (3) the Pesticide Applicators' Act, § 35–10–101, et seq., C.R.S.2004; (4) §§ 35–1.5–101 to 35–1.5–103, C.R.S.2004, the preemption provisions of Title 35, "Agriculture"; and (5) §§ 35–3.5–101 to 35–3.5–103, C.R.S.2004, which address the nuisance liability of agricultural operations.

■ The purpose of the preemption doctrine is to establish a priority among poten-

tially conflicting laws enacted by various levels of government. *Board of County Commissioners v. Bowen/Edwards Associates, Inc.*, 830 P.2d 1045 (Colo.1992)(*Bowen/Edwards* ).

It is undisputed that protection of public water supplies is a matter of both state and local concern. In such circumstances, a local ordinance and a state statute may coexist, with both remaining effective and enforceable, as long as they do not contain express or implied conditions that are irreconcilably in conflict with each other. *Bowen/Edwards, supra; Board of County Commissioners v. Martin,* 856 P.2d 62 (Colo.App.1993). However, if there is a conflict, the local ordinance may be preempted. *Board of County Commissioners v. Martin, supra.*

■ Where both state and local concerns are present, a three-part analysis is applied to determine whether the local ordinance is preempted by state law. First, the express language of the state statute may indicate state preemption of all local authority over the subject matter. Second, preemption may be inferred if the state statute impliedly evinces a legislative intent to occupy a given field completely by reason of a dominant state interest. Third, a local ordinance may be partially preempted where its operational effect would conflict with the application of the state statute. *Bowen/Edwards, supra; Town of Frederick, supra.*

■ Express preemption arises when the express language of the statute indicates the state's intent to preempt all local authority over the given subject matter. In such cases, the General Assembly will have provided a clear and unequivocal statement of intent to prohibit the exercise of local government authority in matters of shared state and local interest. *Board of County Commissioners v. Bainbridge, Inc.,* 929 P.2d 691 (Colo.1996).

■ In regard to implied preemption, the supreme court has recognized that a legislative intent to preempt local control over certain activities cannot be inferred merely from the enactment of a state statute addressing certain aspects of these activities. Rather, whether the General Assembly intended to occupy a field completely, to the exclusion of all other regulation, must be measured not only by the language used but also by the whole purpose and scope of the legislative scheme, including the particular circumstances upon which the statute was intended to operate. *Bowen/Edwards, supra.*

■ State preemption by reason of operational conflict—the third type of preemption—can arise where the effectuation of a local interest would materially impede or destroy the state interest. In such circumstances, local regulations may be partially or totally preempted to the extent they conflict with the achievement of the state interest. *Bowen/Edwards, supra; Town of Frederick, supra* (setback, noise abatement, and visual impact provisions of municipal ordinance, which prohibited drilling of oil and gas wells within municipality limits unless special use permit was first obtained, were preempted on basis of operational conflict with state law).

■ "Any determination that there exists an operational conflict between [local] regulations and the state statute or regulatory scheme ... must be resolved on an ad-hoc basis under a fully developed evidentiary record." *Bowen/Edwards, supra,* 830 P.2d at 1060 (remanding to afford respondent an opportunity to specify particular county regulations that were in operational conflict with state law and to develop adequate evidentiary record on preemption issue); *see also Mt. Emmons, supra* (remanding to develop facts necessary to determine whether town's watershed district permit ordinance was preempted or otherwise invalid).

None of the statutes on which GSS relies contains a "clear and unequivocal statement of intent to prohibit" all local authority over its subject matter. *See Board of County Commissioners v. Bainbridge, Inc., supra,* 929 P.2d at 710. We examine the statutes individually to determine (1) whether preemption may be inferred because they impliedly evince a legislative intent to occupy their field completely, and (2) whether they entirely or partially preempt the Town's ordinance as applied here by reason of operational conflict.

### 1. *CWQCA*

■ In enacting the CWQCA, the General Assembly declared it the policy of this state "to achieve the maximum practical degree of water quality in the waters of the state consistent with the welfare of the state"; "to provide that no pollutant be released into any state waters without first receiving the [necessary] treatment or other corrective action"; and "to provide for the prevention, abatement, and control of new or existing water pollution." It also declared that "protection of the quality of state waters and the prevention, abatement, and control of water pollution are matters of statewide concern." Section 25–8–102(1)–(3), C.R.S.2004.

The CWQCA clearly expresses the state's interest in preventing and controlling water pollution—which is also the subject of the Town's ordinance. However, there is no express statement of intent to prohibit local regulation in this area, and we discern no basis for concluding that the legislature intended to occupy the field of water pollution control to the exclusion of all local regulation.

Such implied preemption is not established based solely on the General Assembly's statement that prevention, abatement, and control of water pollution are matters of "statewide concern." *See City of Northglenn v. Ibarra,* 62 P.3d 151 (Colo.2003)(some matters are not exclusively of local or statewide concern, but are properly of concern to both cities and the state; in these matters of mixed concern, local enactments and state statutes may coexist if they do not conflict).

Nor is it dispositive of the implied preemption issue that the statute and the agencies authorized under it are designated as "the final authority in the administration of water pollution prevention, abatement, and control." Section 25–8–102(4), C.R.S.2004; *see Mt. Emmons, supra,* 690 P.2d at 242 ("[I]t does not follow that merely because the Colorado Water Quality Control Commission has 'final authority' in the administration of water pollution prevention, § 25–8–104(2), … any permit issued … pursuant to the ordinance would thereby be invalid.").

That the CWQCA does not impliedly preempt the Town's ordinance is also supported by language in the CWQCA and elsewhere that expressly contemplates local regulation of water pollution. *See* § 25–8–102(4) ("Notwithstanding any other provision of law … no municipal corporation … *having jurisdiction over water pollution prevention, abatement, and control,* shall issue any authorization for the discharge of pollutants into state waters unless authorized to do so in accordance with this article" (emphasis added)); *see also* § 31–15–707(1)(b) (discussed above, giving municipalities authority to protect their waterworks from injury and the water from pollution).

We thus find no legislative intent to occupy the entire field of water pollution control, and, accordingly, no implied preemption of the Town's ordinance.

■ We next consider whether application of the ordinance in this case results in an operational conflict with the CWQCA.

The Town's ordinance was applied here to preclude GSS from using *any* agricultural chemicals "in any manner that may pollute the town's water supply as defined in the ordinance." The CWQCA, however, contemplates that certain levels of agricultural chemicals may be used. *See* § 25–8–205.5(1), C.R.S.2004 ("The general assembly hereby declares that the public policy of this state is to protect groundwater … from impairment or degradation due to the improper use of agricultural chemicals *while allowing for their proper and correct use.*" (emphasis added) ); § 25–8–205(1)(a), C.R.S.2004 (authorizing water quality control commission to promulgate regulations to "describe prohibitions, standards, concentrations, and effluent limitations on the extent of specifically identified pollutants … that any person may discharge into any specified class of state waters").

An operational conflict could exist if the Town's ordinance, as applied here, proscribes even the proper use of agricultural chemicals that GSS would be entitled to use under the CWQCA and its regulations. The fact that the ordinance imposes more stringent requirements than those required under state law, rather than permitting activities not permitted under state law, does not preclude the determination that an operational conflict ex-

ists. *See Denver & Rio Grande Western Railroad v. City & County of Denver*, 673 P.2d 354, 361 n. 11 (Colo.1983)("A conflict exists if the ordinance permits what the statute prohibits or vice versa."); *Town of Frederick, supra* (rejecting contention that there can be no irreconcilable operational conflict between an ordinance and a statute where the ordinance simply goes further in its prohibition).

Because the existence of an operational conflict is a factual determination that must be resolved on a fully developed evidentiary record, and because GSS was precluded from developing testimony at trial that would have permitted the court to determine this issue, the matter must be remanded to permit the presentation of evidence bearing on whether application of the Town's ordinance here resulted in an operational conflict with the CWQCA. *See Bowen/Edwards, supra; Mt. Emmons, supra.*

### 2. *CDWQA*

■ We reach a similar conclusion with respect to preemption of the ordinance by the CDWQA.

The CDWQA delineates certain powers and duties of the department of public health and environment with respect to drinking water, including the adoption and enforcement of "minimum general sanitary standards and regulations to protect the quality of drinking water supplied to the public." Section 25–1.5–203(1)(b)(I), C.R.S.2004. However, there is no language in the CDWQA indicating that it is intended to preempt all local regulation of drinking water. On the contrary, § 25–1.5–207(2), C.R.S.2004, which addresses remedies for contamination of drinking water, states that, with exceptions not relevant here, "nothing in this section shall be construed to condition, restrict, or prevent any other civil ... actions which may be brought by ... any political subdivision pursuant to ... any local ordinance or regulation."

In light of this provision, and for the reasons discussed above in regard to the CWQCA, we conclude the CDWQA does not impliedly preempt the Town's ordinance.

Although the CDWQA provides for the promulgation of regulations setting "[m]inimum general sanitary standards for the quality of water supplied to the public," it states that such standards "shall be no more stringent than the drinking water standards promulgated pursuant to the federal 'Safe Drinking Water Act,' if such standards exist." Section 25–1.5–202(2), C.R.S.2004. As noted, GSS was precluded from introducing evidence that the herbicides it proposed to use on its property were consistent with state and federal safe drinking water standards.

Thus, we again conclude that, on remand, GSS must be given the opportunity to present evidence showing an operational conflict between the Town's ordinance as applied in this case and the CDWQA and its regulations.

### 3. *Pesticide Applicators' Act*

■ The Pesticide Applicators' Act includes the General Assembly's recognition that "regulation of pesticide use is necessary to prevent adverse effects on individuals and the environment." Section 35–10–102, C.R.S. 2004. Section 35–10–112.5(1), C.R.S.2004, states that the General Assembly

> further finds that a system of pesticide regulation that is consistent and coordinated, that creates statewide uniform standards, and that conforms with both state and federal technical standards and requirements is essential to the public health, safety, and welfare, and finds that *local regulation of pesticides that is inconsistent with and adopts different standards from federal and state requirements does not assist in achieving these benefits.*

(Emphasis supplied.)

However, the Act goes on to state: "Nothing in this article may be construed to limit the authority of a local government ... to ... adopt regulations to protect surface or groundwater drinking supplies *consistent with state or federal law concerning the protection of drinking water supplies.*" Section 35–10–112.5(3)(a)(I), C.R.S.2004 (emphasis supplied).

Like the statutes discussed above, the Pesticide Applicators' Act does not evince an intention to occupy completely the area of pesticide regulation and, in fact, expressly recognizes the authority of local governments to adopt regulations. Thus, there is no implied preemption. However, on remand, GSS may be able to establish preemption based on operational conflict by showing that its use of agricultural chemicals was "consistent with state or federal law concerning the protection of drinking water supplies," § 35–10–112.5(3)(a)(I), but that the Town's ordinance was applied to preclude it from using such chemicals.

### 4. *Sections 35–1.5–101 to 35–1.5–103*

█ Article 1.5 of Title 35 addresses preemption issues arising under the State Department of Agriculture Act of 1949.

Section 35–1.5–101(1)(a), C.R.S.2004, states: "Nothing in this article shall be construed to limit the authority of a local government to ... protect surface or ground water drinking water supplies in accordance with current state or federal applicable law." Further, "[t]he lack of a provision in this article explicitly preempting local government regulation of any particular agricultural chemical not listed in section 35–1.5–102(2) shall not be construed as an implicit grant of authority to a local government pursuant to this article to regulate on that subject." Section 35–1.5–101(2), C.R.S.2004.

Again, these statutes do not preempt all local authority to protect ground water drinking water supplies, as long as such regulation is "in accordance with current state or federal applicable law." Section 35–1.5–101(1)(a). While there is thus no implied preemption of all local regulation, there may nevertheless be an operational conflict with the Town's ordinance if, as applied here, the ordinance purports to regulate in a manner that was not in accordance with state law. Accordingly, GSS must be given the opportunity to present evidence on this issue on remand.

### 5. *Sections 35–3.5–101 to 35–3.5–103*

█ Article 3.5 of Title 35 is captioned "Nuisance Liability of Agricultural Operations." Section 35–3.5–101, C.R.S.2004, states that the purpose of the article is to "reduce the loss to the state of Colorado of its agricultural resources by limiting the circumstances under which agricultural operations may be deemed to be a nuisance."

Section 35–3.5–102(1)(a), C.R.S.2004, states that, "Except as provided in this section, an agricultural operation shall not be found to be a public or private nuisance if the agricultural operation alleged to be a nuisance employs methods or practices that are commonly or reasonably associated with agricultural production."

"Agricultural operation" has the same meaning, for purposes of this article, as "agriculture," as defined in § 35–1–102(1), C.R.S.2004. *See* § 35–3.5–102(4), C.R.S.2004. "Agriculture," as defined in § 35–1–102(1), is a broad term that encompasses livestock operations and "any and all forms of farm products and farm production."

The plain language of §§ 35–3.5–101 to 35–3.5–103 neither expressly nor impliedly preempts all local regulation affecting agricultural operations. However, the statutes do preclude such regulation, and preclude a municipality from seeking relief under a nuisance theory, if the agricultural operation alleged to be a nuisance employs methods or practices that are commonly or reasonably associated with agricultural production.

Whether GSS's business constitutes an agricultural operation is an issue on which the parties disagree, and we cannot resolve the question on the record before us. If GSS establishes that its business is an agricultural operation, and that it employs methods or practices that are commonly or reasonably associated with agricultural production, application of the Town's ordinance here to preclude GSS from continuing to employ such methods or practices would give rise to an operational conflict between the ordinance and state law.

On remand, GSS should be allowed to present evidence that the agricultural chemicals it uses are "commonly or reasonably associated with agricultural production." Section 35–3.5–102(1)(a). The Town should be afforded the opportunity to counter this

evidence and also to present evidence supporting its contention that GSS does not conduct an "agricultural operation" on the property.

## III.

 Because the issue may arise on remand if the trial court determines that the Town's ordinance is not preempted, we also address, and reject, GSS's contention that injunctive relief was unwarranted absent any finding of existing harm, or of an immediate threat of harm, to the Town's water supply.

A showing of irreparable injury is not invariably required where a statute or ordinance authorizes a governmental entity to seek relief to prevent harm to the public. *See Kourlis v. District Court,* 930 P.2d 1329 (Colo.1997)(where statute empowered commissioner of agriculture to enforce its provisions and obtain recourse in courts to enjoin violations, commissioner was not required to prove irreparable injury or inadequacy of remedy at law when seeking either preliminary or permanent injunctive relief); *Lloyd A. Fry Roofing Co. v. State Dep't of Health Air Pollution Variance Board,* 191 Colo. 463, 553 P.2d 800 (1976)(state agency did not have to show irreparable injury before obtaining injunction to prevent violation of air quality standards); *see also Conservation Commission v. Price,* 193 Conn. 414, 479 A.2d 187 (1984)(injunctive relief proper for violation of town's regulations regarding protection of its water supply, even absent a showing of present harm).

As noted above, § 31–15–401(1)(c) authorizes municipalities to "declare what is a nuisance and abate the same." The Town's code likewise authorizes it to "summarily abate" public nuisances. Carbondale Municipal Code § 1.01.080. Thus, if the ordinance is deemed enforceable, injunctive relief may be ordered by the trial court on the grounds set forth in its original judgment, without a showing of immediate irreparable injury.

The judgment ordering a decree of abatement is reversed, and the case is remanded for further proceedings in accordance with the views expressed here.

Judge ROTHENBERG and Judge WEBB concur.