**COLORADO MINING ASSOCIATION,**
**Plaintiff–Appellee,**

v.

**BOARD OF COUNTY COMMISSIONERS OF SUMMIT COUNTY, Defendant–Appellant,**

and

**Alliance for Responsible Mining and Blue River Group of the Sierra Club, Intervenors–Defendants–Appellants.**

No. 05CA1996.

Colorado Court of Appeals,
Div. IV.

March 22, 2007.

Rehearing Denied May 10, 2007.

Certiorari Granted Nov. 13, 2007.

McKenna, Long & Aldridge, LLP, Paul M. Seby, Timothy R. Odil, Denver, Colorado, for Plaintiff–Appellee.

Jeff Huntley, County Attorney, Breckenridge, Colorado; Berg, Hill, Greenleaf & Ruscitti, LLP, Josh A. Marks, Heidi C. Potter, Boulder, Colorado, for Defendant–Appellant.

Jeffrey C. Parsons, Roger Flynn, Lyons, Colorado, for Intervenors–Defendants–Appellants.

John W. Suthers, Attorney General, Cheryl A. Linden, First Assistant Attorney General, Denver, Colorado, for Amici Curiae Colorado Mined Land Reclamation Board and Colorado Division of Minerals and Geology.

Opinion by Judge ROMÁN.

In this declaratory judgment action, defendants, the Board of County Commissioners of Summit County (the County), the Alliance for Responsible Mining, and the Blue River Group of the Sierra Club, appeal the trial court judgment in favor of plaintiff, the Colorado Mining Association (CMA). The court declared certain amendments to the County's land use and development code to be invalid as preempted by the Colorado Mined Land Reclamation Act, § 34–32–101, et seq., C.R.S. 2006 (MLRA). We affirm in part, reverse in part, and remand with directions.

## I. Background

Resolution of this appeal depends on the language of the MLRA and the County's amendments and on the procedural posture of CMA's facial challenge to the amendments, which we now review.

## A. MLRA

The MLRA was enacted in 1976

> to foster and encourage the development of an economically sound and stable mining and minerals industry and to encourage the orderly development of the state's natural resources, while requiring those persons involved in mining operations to reclaim land affected by such operations so that the affected land may be put to a use beneficial to the people of this state.

Section 34–32–102(1), C.R.S.2006. In accordance with this purpose, the MLRA created the Mined Land Reclamation Board to promulgate standards for reclamation plans and established a permitting scheme for mining operations. Sections 34–32–105(1), 34–32–109, 34–32–112, C.R.S.2006.

The MLRA also prohibits any office or political subdivision, other than the Mined Land Reclamation Board, from (1) issuing permits pursuant to the MLRA, (2) requiring reclamation standards that differ from the MLRA, or (3) requiring a performance or financial warranty of any kind for mining operations. Section 34–32–109(6).

Beginning in 1987, a series of failures at a Summitville mine led the Environmental Protection Agency to exercise its authority to enter the site and begin remediation under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C. § 9601, et seq. Cyanide contaminated water had been discharged into neighboring creeks and ponds, and the mining operator declared bankruptcy before cleanup could begin. The Summitville site was ultimately categorized as one of the nation's most polluted sites. *Aztec Minerals*

*Corp. v. Romer,* 940 P.2d· 1025 (Colo.App. 1996).

In 1993, the MLRA was amended to create a new class of mine called a designated mining operation (DMO). Section 34–32–112.5, C.R.S.2006. A DMO is a mining operation where (1) toxic or acidic chemicals used in extractive metallurgical processing are present on site or (2) acid or toxic-forming materials will be exposed or disturbed as a result of mining operations. Section 34–32–103(3.5), C.R.S.2006. The amendment also established a more stringent permitting program for DMOs and required that applicants prepare and adopt environmental protection plans. Section 34–32–116.5, C.R.S.2006.

### B. Summit County Land Use and Development Code

In 2004, Summit County adopted amendments to its land use and development code. In adopting the amendments, the County intended "to allow mining/milling operations in Summit County provided that adverse impacts of such operations are adequately mitigated." Section 3812. The amendments established permissible zoning districts for mining and milling operations and also prohibited all mining in certain zoning districts. The amendments contained "performance standards" for, inter alia, air quality, noise, transportation facilities, and visual and scenic quality. Section 3812.05. The amendments also stated that the "limited standards of performance or criteria by which to evaluate or regulate mining/milling operations can help mitigate possible adverse on-site and off-site impacts." Section 3812.

### C. Procedural History

Without having applied for a permit, CMA filed suit seeking facially to invalidate two specific provisions in the amendments: one provision prohibits cyanide and other toxic or acidic ore-processing reagents in heap or vat leach applications, § 3812.04, and the other describes performance standards for designated chemicals and hazardous materials, § 3812.05(H).

On cross-motions for summary judgment, the court declared that the two amendments were expressly preempted by the MLRA.

### II. Standard of Review

We review de novo an order granting summary judgment, applying the same standards that govern the trial court's determination. *Svendsen v. Robinson,* 94 P.3d 1204 (Colo. App.2004). Summary judgment is appropriate where there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. C.R.C.P. 56(c); *McIntyre v. Bd. of County Comm'rs,* 86 P.3d 402 (Colo.2004).

Here, summary judgment was entered in the context of an action for declaratory relief. Pursuant to § 13–51–106, C.R.S. 2006, and C.R.C.P. 57, a party whose rights are affected by a statute or ordinance may bring a declaratory judgment action to have the court determine "questions of construction, validity, rights, status, or other legal relations thereunder." *Jam Action, Inc. v. Colo. State Patrol,* 890 P.2d 210, 212 (Colo. App.1994).

### III. Preemption

Defendants contend that the trial court erred in concluding that the two amendments were expressly preempted. We agree that the ban on cyanide and other reagents in leach applications is not preempted, but conclude the performance standards for designated chemicals and hazardous materials are preempted.

"The purpose of the preemption doctrine is to establish a priority between potentially conflicting laws enacted by various levels of government." *Bd. of County Comm'rs v. Bowen/Edwards Assocs., Inc.,* 830 P.2d 1045, 1055 (Colo.1992). A county regulation may be invalid if it conflicts with or is preempted by state law. *See* § 30–15–411, C.R.S.2006; *Town of Carbondale v. GSS Props., LLC,* 140 P.3d 53 (Colo.App.2005) *(cert. granted* July 17, 2006, 2006 WL 1976546). Where the regulated matter is of both state and local concern, a local regulation and a state statute may coexist, with both remaining effective and enforceable as long as they do not contain express or implied conditions that irreconcilably conflict

with each other. *Bowen/Edwards, supra.* If a conflict exists, the local regulation may be preempted. *Bd. of County Comm'rs v. Martin,* 856 P.2d 62 (Colo.App.1993).

■ There are three ways that a state statute can preempt a county regulation. First, the express language of the statute may indicate preemption over local authority; second, preemption may be inferred if the statute impliedly evinces a legislative intent completely to occupy a given field; and third, a local law may be partially preempted where its operational effect conflicts with the application of the statute. *Bowen/Edwards, supra.*

■ Because CMA instituted a facial challenge to the County regulations and was not denied a permit, we narrow the focus of our inquiry. *See Bd. of County Comm'rs v. BDS Int'l, LLC,* 159 P.3d 773 (Colo.App. 2006). That is, CMA must demonstrate that the MLRA would preempt any possible condition the County could place on its permit. *See Cal. Coastal Comm'n v. Granite Rock Co.,* 480 U.S. 572, 580, 107 S.Ct. 1419, 1424, 94 L.Ed.2d 577 (1987) (purely facial preemption challenge requires that "there is no possible set of conditions the [local regulator] could place on its permit that would not conflict with" federal (or state) law); *Bowen/–Edwards, supra.* We turn first to the doctrine of express preemption.

### A. Express Preemption

■ A state statute expressly preempts a local regulation when the express statutory language indicates "preemption of all local authority over the subject matter." *Bowen/Edwards, supra,* 830 P.2d at 1056; *see Martin, supra,* 856 P.2d at 65 (express preemption occurs when statute contains "express language indicating legislative intent to preempt totally local regulation").

At the outset, we reject the County's contention that the trial court erred in limiting the scope of its preemption analysis to the area of mined land reclamation and refusing to expand the scope to mining as a whole.

The preemption language contained in the MLRA provides:

No governmental office of the state, other than the board, nor any political subdivision of the state shall have the authority [1] to issue a reclamation permit pursuant to this article, [2] to require reclamation standards different than those established in this article, or [3] to require any performance or financial warranty of any kind for mining operations.

Section 34–32–109(6), C.R.S.2006.

The statute further requires, however, that any mining operator must "comply with city, town, county, or city and county land use regulations," and "[a]ny mining operator subject to this article shall also be subject to zoning and land use authority and regulation by political subdivisions as provided by law." Section 34–32–109(6).

Another division of this court has interpreted this language and concluded, "The [MLRA] preempts only the authority of local government to set performance standards for mined land reclamation activities, but does not prohibit local regulation by permit of all aspects of land use for mining, including the location of mining operations and related reclamation activities and other environmental and socioeconomic impacts." *C & M Sand & Gravel v. Bd. of County Comm'rs,* 673 P.2d 1013, 1017 (Colo.App.1983).

Recognizing the importance of local land use decision making, the division concluded that the MLRA "is primarily concerned with the reclamation of land affected by the extraction of minerals both during and after mining operations." *C & M Sand & Gravel, supra,* 673 P.2d at 1017. The division found it significant that the MLRA fails to mention many matters of traditional local zoning regulation, such as "nuisance conditions, off-site safety problems, and the nature of the end use of the land." *C & M Sand & Gravel, supra,* 673 P.2d at 1017.

■ Though the MLRA was amended after *C & M Sand & Gravel* was decided, the statutory amendments do not include language expressly preempting any other area of local authority. Had the General Assembly intended expressly to preempt areas of mining other than performance standards for mined land reclamation activities, we assume

it would have done so. *See People in Interest of J.C.P.*, 151 P.3d 635 (Colo.App. 2006)(our interpretation of a statute begins with the clear statutory language); *see also Martin, supra,* 856 P.2d at 65 (express preemption requires express language). Because the General Assembly has not altered the division's interpretation of the preemption language, but has made other changes to the statute, we conclude the language has been appropriately construed. *See People v. Swain,* 959 P.2d 426, 430–31 (Colo.1998) ("Under an established rule of statutory construction, the legislature is presumed, by virtue of its action in amending a previously construed statute without changing the portion that was construed, to have accepted and ratified the prior judicial construction.").

Thus, we must next determine whether the County's amendments constitute reclamation standards. We conclude that the ban on cyanide and other reagents is not a reclamation standard, but that performance standards for designated chemicals and hazardous materials are such standards.

Under the MLRA,

"[r]eclamation" means the employment during and after a mining operation of procedures reasonably designed to minimize as much as practicable the disruption from the mining operation and to provide for the establishment of plant cover, stabilization of soil, the protection of water resources, or other measures appropriate to the subsequent beneficial use of such affected lands.

Section 34–32–103(13), C.R.S.2006.

■ MLRA reclamation standards include, but are not limited to, "prevention of acid mine drainage, maintenance of the hydrologic balance in the watershed, maintenance of water quality and quantity, soil stabilization on the mine site to prevent landslides or erosion, and, where practical, revegetation with self-sustaining plant species." *Aztec Minerals Corp., supra,* 940 P.2d at 1027.

#### 1. Ban on Cyanide and Other Reagents

■ Defendants contend the trial court erred in concluding that the ban on cyanide and other reagents is a reclamation standard. We agree.

Summit County's § 3812.04 provides, "Any mining or milling operation that utilizes cyanide or other toxic/acidic ore-processing reagents in heap or vat leach applications shall not be allowed in any zoning district."

As discussed, under the MLRA, a reclamation procedure is one designed to minimize disruption *"during and after* a mining operation." Section 34–32–103(13) (emphasis added). Thus, the procedure must take place while the mining is being conducted or after the mining is completed. Here, the ban stops certain mining from ever beginning. Therefore, it takes effect *before* mining begins.

Additionally, reclamation procedures must occur on "affected lands." An "[a]ffected land' means the surface of an area within the state where a mining operation is being or will be conducted, which surface is disturbed as a result of such operation." Section 34–32–103(1.5). As explained above, the cyanide and other reagents ban prevents the surface from becoming disturbed because it prohibits the mining operation from the start. Therefore, the ban does not occur on affected lands.

Finally, the ban on cyanide and other reagents cannot be considered a reclamation standard because it does not provide for establishment of plant cover, stabilization of soil, protection of water resources, or other reclamation measures as required by the MLRA. Therefore, the ban on cyanide and other reagents in § 3812.04 does not involve or set performance standards for reclamation activities, and § 3812.04 is not expressly preempted by the MLRA on that basis.

We likewise reject CMA's related assertion that the MLRA preempts all local regulation of DMOs or those mining operations that use toxic or acidic chemicals or extract acid or toxic-forming materials (chemical mining).

The MLRA contains no explicit language preempting local authority over chemical mining, and therefore, it does not expressly preempt it. *See* §§ 34–32–109, 34–32–112.5. The mere fact that the MLRA expressly regulates toxic and acidic chemicals does not

mean that all local regulation over the same chemicals is automatically preempted. The MLRA does not expressly require that all DMOs be permitted or require that all designated chemicals be allowed in all areas. Rather, it specifically requires that mining operators comply with zoning and land use regulations adopted by political subdivisions, such as those adopted by the County here. *See* § 34–32–109(6).

Thus, we conclude § 3812.04 is not expressly preempted by the MLRA.

### 2. Designated Chemicals Performance Standards

■■■ Defendants likewise contend the trial court erred in concluding that the designated chemicals performance standards in § 3812.05(H) are reclamation standards. We disagree.

That provision states:

The following performance standards are regulated to some extent through the Division of Minerals and Geology (DMG). The need for reviewing the following performance standards and requested information should be addressed with the project proponent during the presubmittal meeting. A copy of applicable mining and reclamation permits or applications transmitted to the DMG shall be provided to the Planning Department with the submittal of a request for a mining/milling conditional use permit. If not already included in the DMG permits or applications, the following information may be required . . .

H: Designated Chemicals & Hazardous Materials: It is hereby determined that any proposed mining or milling operation that would use one or more designated chemicals classified as toxic or acidic as a processing agent by the Colorado Division of Minerals and Geology poses a potential risk of environmental harm due to the toxicity of such chemicals and their ability to cause damage to the environment if not properly managed. The use of such chemicals designated as toxic/acidic shall not be permitted as part of any mining or milling operation unless the project applicant can demon-

strate, based on reliable scientific data, that the proposed use of such designated chemicals in a given project will not cause adverse environmental impacts.

The use, transport, storing, distribution or production of hazardous materials in connection with mining/milling operations shall be minimized to the extent reasonably possible.

The provision then lists six "management and mitigation" methods "that may be used to ensure that any operations do not pose an unreasonable risk of a release of a designated chemical or hazardous materials and to prevent any adverse impact to Summit County." These methods focus on the use, transport, storage, distribution, and production of the chemicals. They also may require information demonstrating that the use of any chemicals "will not have an adverse impact upon the public health, safety, welfare or environment" and descriptions of management practices, such as groundwater monitoring and "reclamation and closure plan[s] for facilities."

On its face, this provision regulates the same procedures contemplated by the MLRA. In particular, it appears designed to minimize the disruption of a mining operation and to protect water resources from the chemicals used during mining operations. *See* § 34–32–103(13).

Moreover, the provision acknowledges that its "performance standards are regulated to some extent through the Division of Minerals and Geology (DMG)." The Office of Mined Land Reclamation, created by the MLRA, is part of the DMG. *See* § 34–32–105(1). The use of the MLRA terminology in this provision, such as "performance standards" and "reclamation" plan, coupled with the provision's reference to the DMG, indicates that the provision regulates reclamation performance standards as defined by the MLRA.

Therefore, § 3812.05(H) regulates reclamation activities as defined by the MLRA and sets subsequent performance standards based on those reclamation activities. Moreover, as evidenced by the provision's acknowledgment that information not already

included in the DMG permit may be required by the County, the provision's performance standards differ from those required by the MLRA. Thus, we conclude § 3812.05(H) is expressly preempted by the MLRA. *See Bowen/Edwards, supra.*

### B. Implied or Operational Preemption

Though not considered by the trial court, we next address whether the MLRA impliedly preempts the cyanide and other reagents ban or whether an operational conflict partially preempts the provision. *See Lane v. Urgitus,* 145 P.3d 672 (Colo.2006) (appellate court may draw its own conclusion when facts are presented to the trial court by uncontested documentary evidence); *Svendsen v. Robinson, supra* (appellate court applies same standards as trial court in reviewing summary judgment). We conclude that the MLRA and § 3812.04 can coexist.

### 1. Implied Preemption

■ "[P]reemption may be inferred if the state statute impliedly evinces a legislative intent to completely occupy a given field by reason of a dominant state interest." *Bowen/Edwards, supra,* 830 P.2d at 1056–57.

■■ "[L]egislative intent to preempt local control over certain activities cannot be inferred merely from the enactment of a state statute addressing certain aspects of those activities." *Bowen/Edwards, supra,* 830 P.2d at 1058. Rather, to determine whether the legislature intended completely to occupy a field to the exclusion of all other regulation, we must examine not only the language, but also the overriding purpose and scope of the legislative scheme. *Bowen/Edwards, supra,* 830 P.2d at 1058; *see Bd. of County Comm'rs v. Bainbridge, Inc.,* 929 P.2d 691 (Colo.1996).

■ Though the MLRA focuses on a stable and economically sound mining industry, it also requires that mining operators "comply with city, town, county, or city and county land use regulations." Section 34–32–109(6). As amended in 1993, the MLRA reiterates:

> No part of the proposed mining operation, the reclamation program, or the proposed future use is or may be contrary to the laws or regulations of this state or the United States, including but not limited to all federal, state, and local permits, licenses, and approvals, as applicable to the specific operation.

Section 34–32–115(4)(c)(I), C.R.S.2006.

Subsequent to the MLRA's 1993 amendments, the Mined Land Reclamation Board promulgated additional rules. In responding to a comment concerning § 34–32–115(4), C.R.S.2006, and its corresponding Rule 6.4.19(4)(d), the Board stated:

> This part of the [MLRA] refers to those local, state and Federal laws and regulations that pertain to protection of human health, property or the environment. The Board believes that all land-use decisions rest with other local, state, and federal land agencies. Otherwise, the Board would be in the position of making land-use decisions that may be contrary to the interests or desires of local citizens, and contrary to the state law and scope of this [MLRA].

Dep't of Natural Resources, Statement of Basis Specific Statutory Authority and Purpose: Amendments to the Mineral Rules and Regulations (Apr. 13, 1994) (on file with the Colorado State Archives).

The MLRA's original preemption language, which recognizes a county's land use power, read together with amended § 34–32–115(4), which reiterates that power, supports the conclusion that the General Assembly did not intend to preempt all local regulation of land use in the area of chemical mining. *See Town of Frederick v. N. Am. Res. Co.,* 60 P.3d 758 (Colo.App.2002).

Coupled with the MLRA's stricter permitting requirements for DMOs, the fact that DMOs are only one type of mining operation considered by the MLRA indicates that economically sound mining does not depend on the continuance of all chemical mining. Indeed, as stated earlier, the MLRA does not require or even suggest that all DMOs will be granted a permit or that DMOs must be allowed.

Additionally, the state's interest in uniform regulation of the technical aspects and per-

mitting of chemical mining does not militate in favor of an implied legislative intent to preempt all aspects of a county's land use authority. *See Bowen/Edwards, supra.* In fact, as discussed above, the MLRA expressly recognizes local land use authority in the area of mining, "including the location of mining operations." *See C & M Sand & Gravel, supra,* 673 P.2d at 1017. Likewise, the supreme court has recognized the importance of local land use regulation in conjunction with the MLRA. *See Colo. State Bd. of Land Comm'rs v. Colo. Mined Land Reclamation Bd.,* 809 P.2d 974 (Colo.1991).

Considered as a whole, the language of the MRLA does not imply an intent that the state completely occupy the field of chemical mining to the exclusion of all local regulation. The statute merely addresses certain aspects of chemical mining and does not impliedly preempt the cyanide and other reagents ban. *See Bowen/Edwards, supra* (statute does not impliedly preempt all aspects of county's land use authority over land otherwise subject to state regulations).

### 2. Operational Conflict

Finally, we address and reject CMA's contention that § 3812.04 is in operational conflict with the MLRA.

■ "[L]ocal authority may also be subject to partial preemption if the operational effect of the local regulation would conflict with the application of the state ... statutes." *Starr Fireworks, Inc. v. W. Adams County Fire Dep't,* 903 P.2d 1202, 1204 (Colo. App.1995); *see also Bowen/Edwards, supra.*

■ Operational conflicts "arise where the effectuation of a local interest would materially impede or destroy the state interest." *Bowen/Edwards, supra,* 830 P.2d at 1059; *see N. Am. Res. Co., supra.* "[I]n determining whether [local regulations] are in operational conflict with state statute or regulation, we will construe the [local regulations], if possible, so as to harmonize them with the applicable state statutes or regulations." *BDS Int'l, supra,* 159 P.3d at 779.

■ The "existence of an operational conflict is a factual determination that must be resolved on a fully developed evidentiary record." *GSS Props., supra,* 140 P.3d at 62.

Here, the parties had an opportunity fully to establish the record at trial and agreed that the case should be determined on summary judgment. We have the full record before us and, therefore, are in the same position as the trial court to make a determination on operational conflict. Unlike in *Bowen/Edwards* and *GSS Properties,* where the parties were not afforded an opportunity fully to establish their evidentiary record, and in *BDS International,* where the local government contended that the trial court erred by invalidating its regulations without an evidentiary hearing, no similar situation or contention exists here.

■ CMA, relying on *Voss v. Lundvall Bros., Inc.,* 830 P.2d 1061 (Colo.1992), argues that a county is prohibited from completely banning activities in which the state has declared a compelling interest. However, while a complete ban on mining would run counter to the MLRA, the County's § 3812.04 here falls far short of a complete ban. In fact, as demonstrated by the affidavits attached to CMA's motion for summary judgment, the only active mine referenced that would potentially be affected by § 3812.04 does not use the prohibited heap or vat leach applications.

Further, *Voss* clarifies that if the city had imposed other land use regulations that did not completely ban oil and gas drilling, and those regulations did not frustrate and could be harmonized with the Oil and Gas Conservation Act's goals, the regulations would not be preempted. *Voss, supra,* 830 P.2d at 1068–69; *see N. Am. Res. Co., supra,* 60 P.3d at 761–62 (explaining that while *Voss* found a complete ban impermissible, it did not foreclose all local regulation). Similarly, we conclude the cyanide and other reagents ban does not frustrate the MLRA's goals.

As discussed above, the MLRA focuses on development of an economically sound and stable mining industry. *See* § 34–32–102(1). In our view, a ban on one specific type of mining as a county's exercise of its land use powers does not materially impede or destroy the state's interest in an economically sound and stable mining industry. Here,

§ 3812.04 bans cyanide and other toxic or acidic chemicals when used in two specific applications. It does not ban all mining.

Likewise, the regulation does not ban mining that the MLRA expressly authorizes. *See Johnson v. Jefferson County Bd. of Health*, 662 P.2d 463, 471 (Colo.1983) ("local government may not forbid that which the state has *explicitly* authorized" (emphasis added)). Although the MLRA includes a section dealing with DMOs and indicates that such operations can qualify for permits, it does not state that DMOs must be permitted in all circumstances. In fact, it requires a stricter permitting standard for those operations.

■■■ Finally, as discussed above, the MLRA recognizes the County's land use and zoning authority. *See* § 34–32–109(6) (mining operator applying for a permit is also "responsible for assuring that the mining operation and the postmining land use comply with city, town, county, or city and county land use regulations"); *C & M Sand & Gravel, supra.* Indeed, a permit may not be issued under the MLRA if it conflicts with such local regulations. *See Colo. State Bd. of Land Comm'rs v. Colo. Mined Land Reclamation Bd., supra* (upholding Mined Land Reclamation Board's decision to deny mining permit that would violate a county's zoning regulation).

Therefore, under the narrowly focused standard for the facial challenge asserted here, particularly where CMA has not demonstrated that it would automatically be granted a permit under the MLRA, *see N. Am. Res. Co., supra*, we cannot say that § 3812.04 and the MLRA would conflict in every application. *See Cal. Coastal Comm'n v. Granite Rock Co., supra.*

## IV. Disposition

In sum, we agree with the trial court's conclusion that § 3812.05(H) is expressly preempted by the MLRA because it sets reclamation standards different from those established in the state statute. However, the MLRA does not expressly preempt § 3812.04, because that provision does not set reclamation standards as defined by the MLRA. Nor is § 3812.04 impliedly preempted, because the General Assembly did not intend completely to occupy the field of chemical mining to the exclusion of all local regulation. Finally, we perceive no operational conflict between § 3812.04 and the MLRA because CMA has not demonstrated that the MLRA and the provision conflict under all possible scenarios.

Summary judgment determining that § 3812.05(H) is preempted is affirmed. Summary judgment determining that § 3812.04 is preempted is reversed, and the case is remanded with directions to enter summary judgment as to that regulation in favor of defendants.

Judge LOEB concurs.

Judge ROY concurs in part and dissents in part.

Judge ROY concurring in part and dissenting in part.

I concur in the majority's holding that § 3812.05(H) of the Summit County land use and development code is expressly preempted by the Mining Land Reclamation Act (MLRA). However, I have concluded that § 3812.04 is expressly or impliedly preempted by the MLRA.

At the outset, I recognize that there may be special and legitimate concerns of Summit County, and other mountain counties, in protecting the ground and surface waters from pollution, particularly in light of recent events. In mountainous terrain there is a minimum of overburden that might filter, dilute, treat, contain, or delay spills of dangerous materials, thereby providing some protection to both surface and ground water.

I have, however, concluded that the regulation of the mining industry with respect to its environmental impact has been expressly preempted by the MLRA and related statutes. That preemption, in my view, includes § 3812.04, which provides: "Any mining or milling operation that utilizes cyanide or other toxic/acidic ore-processing reagents in heap or vat leach applications shall not be allowed in any zoning district." This ordinance prohibits gold mining or milling operations which use cyanide to extract gold from

the ore in which it is found and, perhaps, other mining or milling operations which use similar chemicals in their processes.

In my view, the General Assembly has, by means of its legislative declarations, clearly stated that the development and regulation of the mining industry is a matter of state-wide concern which impliedly preempts regulation by cities, towns, and counties. In addition, the broad express preemption provision of the MLRA taken with the defined terms of the act expressly preempts local authority to regulate mining operations.

The development of natural resources has always been a major activity in this state. Among perhaps others, coal, gold, silver, molybdenum, iron, uranium, lead, zinc, oil, and gas, have been mined, extracted, milled, or otherwise processed in this state. The regulation of these activities has historically rested with federal and state, not local, governments.

The importance of the natural resources industry, particularly mining, to the state has been emphasized by the General Assembly a number of times in different contexts. While the issue of express preemption may turn ultimately on the statute at issue, the pronouncements of the General Assembly in other contexts, in my view, shed some light on its intent that mining is a matter of statewide concern.

The legislative declaration of the MLRA provides:

(1) It is declared to be the policy of this state that the extraction of minerals and the reclamation of land affected by such extraction are both necessary and proper activities. It is further declared to be the policy of this state that both such activities should be and are compatible. It is the intent of the general assembly by the enactment of this article to foster and encourage the development of an economically sound and stable mining and minerals industry and to encourage the orderly development of the state's natural resources, while requiring those persons involved in mining operations to reclaim land affected by such operations so that the affected land may be put to a use beneficial to the people of this state. It is the further

intent of the general assembly by the enactment of this article to conserve natural resources, to aid in the protection of wildlife and aquatic resources, to establish agricultural, recreational, residential, and industrial sites, and to protect and promote the health, safety, and general welfare of the people of this state.

(2) The general assembly further declares that it is the intent of this article to require the development of a mined land reclamation regulatory program in which the economic costs of reclamation measures utilized bear a reasonable relationship to the environmental benefits derived from such measures. The mined land reclamation board or the office, when considering the requirements of reclamation measures, shall evaluate the benefits expected to result from the use of such measures. It is also the intent of the general assembly that consideration be given to the economic reasonableness of the action of the mined land reclamation board or the office. In considering economic reasonableness, the financial condition of an operator shall not be a factor.

(3) The general assembly further finds, determines, and declares that:

(a) It is the policy of this state to recognize that mining operations are conducted by government and private entities;

(b) All people of the state benefit from the reclamation of mined land;

(c) The funding to ensure that reclamation is achieved should be borne equitably by both the public and private sectors;

(d) The funding for enforcement and other activity that is conducted for the benefit of the general public should be supported by the general fund;

(e) It is the policy of this state to allocate resources adequate to accomplish the purposes of this article.

Section 34–32–102, C.R.S.2006.

Similar, if not broader, statements of legislative purpose emphasizing a strong statewide economic interest in the orderly development of natural resources, including mining, appear in other statutes relating to mining and other natural resources. *See*

§ 34–1–104.5, C.R.S.2006 (Geological Survey Act); § 34–1–301, C.R.S.2006 (Preservation of Commercial Mineral Deposits); § 34–201–01, C.R.S.2006 (Mine Health and Safety Act); § 34–32.5–102, C.R.S.2006 (Colorado Land Reclamation Act for the Extraction of Construction Materials Act); § 34–33–102, C.R.S.2006 (Colorado Surface Coal Mining Reclamation Act); § 34–60–102, C.R.S.2006 (Oil and Gas Conservation).

With respect to preemption, the MLRA provides at § 34–32–109(6), 2006:

> No governmental office of the state, other than the board, nor any political subdivision of the state shall have the authority [1] to issue a reclamation permit pursuant to this article, [2] *to require reclamation standards different than those established in this article,* or [3] to require any performance or financial warranty of any kind for mining operations. The operator shall be responsible for assuring that the mining operation and the postmining land use comply with city, town, county, or city and county land use regulations and any master plan for extraction adopted pursuant to section 34–1–304[, C.R.S.2006,] unless a prior declaration of intent to change or waive the prohibition is obtained by the applicant from the affected political subdivisions. Any mining operator subject to this article shall also be subject to zoning and land use authority and regulation by political subdivisions as provided bylaw.

(Emphasis added.)

In addition, the Colorado Surface Coal Mining Reclamation Act contains limitations on local government regulation similar to, but not as detailed as, that contained in the first sentence of § 34–32–109(6). Section 34–33–109, C.R.S.2006. Language almost identical to § 34–32–109(6) also appears in the Colorado Land Reclamation Act for the Extraction of Construction Materials, including the requirement of compliance with local zoning regulations. Section 34–32.5–109, C.R.S. 2006.

The MLRA defines "reclamation" and "mining operation" as follows:

> (8) "Mining operation" means the development or extraction of a mineral from its natural occurrences on affected land. The term includes, but is not limited to, open mining and surface operation and the disposal of refuse from underground and in situ mining. *The term includes the following operations on affected lands: Transportation; concentrating; milling; evaporation; and other processing . . . .*

> (13) "Reclamation" means the employment *during and after a mining operation* of procedures reasonably designed to minimize as much as practicable the disruption from the mining operation and to provide for the establishment of plant cover, stabilization of soil, the protection of water resources, or other measures appropriate to the subsequent beneficial use of such affected lands. Reclamation shall be conducted in accordance with the performance standards of this article.

Section 34–32–103, C.R.S.2006 (emphasis added).

In 1993, the General Assembly added a statutory scheme to the MLRA governing "designated mining operations" which are defined as mining operations at which: "[t]oxic or acidic chemicals used in extractive metallurgical processing are present on-site"; or "[a]cid or toxic-forming materials will be exposed or disturbed as a result of mining operations." Section 34–32–103(3.5)(a), C.R.S.2006. The statute authorizes the Mined Land Reclamation Board to promulgate regulations governing designated mining operations and in doing so it is directed to "consider the economic reasonableness, the technical feasibility, and the level or degree of any environmental concerns which may result from" the size of the parcel occupied and the amount of ore removed annually. Section 34–32–112.5(3), C.R.S.2006. The statute also permits the board to require an inspection and certification of environmental protection facilities constructed at a designated mining operation. Section 34–32–112.5(4), C.R.S.2006. The board has issued regulations as contemplated by the statute which appear to be comprehensive. 2 Code Colo. Regs. 407.1.

There is no dispute that § 3812.04 of the Summit County zoning ordinance prohibits, absolutely, the use of cyanide or other toxic

or acidic ore-processing reagents in heap or vat leach applications in the county. This prohibition of the use of cyanide, with very limited exceptions, precludes gold mining in the county. Therefore, the ordinance is not a "development standard," a "use by special review," or a "conditional use," any of which would indicate that the county officials have some discretion to permit the use under acceptable circumstances or conditions. Instead, it is a "need not apply" prohibition.

## I.

First, with respect to implied preemption, our Constitution grants to home rule cities a full right of governance in both "local and municipal matters." Colo. Const.. art. XX, § 6. Home rule city jurisprudence recognizes matters of statewide, mixed, and local and municipal concern. Within the latter, a home rule city is free to legislate, and its legislation preempts state statutes and regulations. With respect to matters of statewide concern, state statutes and regulations preempt home rule city legislation. In matters of mixed concern, the state statutes and regulations prevail in the event of a conflict. *See generally Fraternal Order of Police v. City & County of Denver,* 926 P.2d 582 (Colo.1996). Counties, on the other hand, have no constitutional source of power or authority, are creatures of the statute, and derive their powers or authority to legislate and regulate from state statutes. *Bd. of County Comm'rs v. Bowen/Edwards Assoc., Inc.,* 830 P.2d 1045 (Colo.1992); *Stermer v. Bd. of Comm'rs,* 5 Colo.App. 379, 38 P. 839 (1894).

The implied preemption jurisprudence arising from the Oil and Gas Conservation Act, § 34–60–101, et seq., provides guidance to the present situation. That act, as I have noted, has a broad legislative declaration similar to that of the MLRA but differs in that it has no express preemption section and does not expressly reserve planning and zoning powers to local government.

In *Voss v. Lundvall Bros., Inc.* 830 P.2d 1061 (Colo.1992), our supreme court held, based on the legislative declaration and scope of regulatory powers of the Oil and Gas Conversation Commission, that a home rule city could not prohibit the drilling. of oil and gas wells within its boundaries. That is, the regulation of the development of oil and gas is a matter of statewide concern and state statute preempts a home rule city's ability to prohibit the activity.

I conclude that after taking into account the similarities and differences in the operative statutes, if a home rule city's authority to prohibit oil and gas development within its municipal boundaries is preempted, so is that of a county which enjoys considerably less autonomy. The same is true of authority to prohibit mining under the MLRA.

In my view, my position is strengthened from the inclusion of the designated mining operation provisions and their inclusion in the MLRA, which evidences the deliberate entry of the state into the regulation of toxic chemicals in mining operations. These provisions define a "designated mining operation" as:

(a) ... [A] mining operation at which: (I) Toxic or acidic chemicals used in extractive metallurgical processing are present on-site; or (II) Acid or toxic-forming materials will be exposed or disturbed as a result of mining operations.

(b) The various types of designated mining operations are identified in section 34–32–112.5. Such mining operations exclude operations which do not use toxic or acidic chemicals in processing for purposes of extractive metallurgy and which will not cause acid mine drainage.

Section 34–32–103(3.5).

The statute authorizes the Mined Land Reclamation Board to adopt regulations governing designated mining operations considering, among other things, environmental concern; issue permits, and require by rule or condition inspection and certification of any new environmental facility. Section 34–32–112.5(3), C.R.S.2006.

Therefore, taking into account the broad legislative declaration and the specific authorization for the Mined Land Reclamation Board to regulate the use of toxic chemicals in mining and milling operations, I have concluded that whatever the extent of the residual county zoning authority over mining, it does not extend to prohibiting a class of

mining, here gold mining, by regulating the use of toxic chemicals.

## II.

Next, with respect to express preemption, the express preemption provision of the MLRA can be abbreviated, as pertinent here, to: "[n]o ... political subdivision of the state shall have the authority ... to require reclamation standards different than those established in this article...." Section 34–32–109(6), C.R.S.2006. While the term "reclamation standard" is not defined, the term "reclamation" is defined to include those procedures used during a "mining operation" reasonably designed to minimize disruption to the mining operation while, at the same time, preserve and protect the environment. Section 34–32–103(13), C.R.S.2006. And, "mining operation" includes transportation, concentrating, milling, evaporation, and other processing of the ore.

The MLRA preemption provision, taken in connection with these definitions, clearly and expressly preempts a county's power to regulate, much less prohibit under the guise of land use and zoning, mining and milling operations and methods. The use of cyanide is just such a method. In addition, the designated mining operating provisions granting the Mined Land Reclamation Board authority to regulate the use of toxic chemicals in mining operations is consistent with an express preemption. I recognize the county retains zoning authority over mining as it relates to compatibility of uses, nuisance, and other related matters.

In my view, that which the General Assembly specifically permits, even encourages, and with respect to which it authorizes an agency of the state to regulate cannot be regulated, much less prohibited, under the rubric of a planning and zoning regulation.